## NEENAN v. OTIS ELEVATOR CO.

(Circuit Court, S. D. New York. June 2, 1910.)

1. PATENTS (§ 218*)—CONTRACT OF ASSIGNMENT—CONSTRUCTION—GUARANTY OF ROYALTIES.

In a contract for the assignment of patents relating to elevators in which the assignee agreed to pay a royalty on each of the elevators it constructed, a provision that, beginning on a specified date, the assignee "shall guarantee that the royalty upon elevators erected and constructed by it * * * shall amount to not less than three thousand dollars," did not obligate the assignee to construct elevators each year the royalty on which should amount to $3,000, but was no more than an agreement to pay that amount if the royalties on the elevators constructed amounted to less.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 218.*]

2. PATENTS (§ 202*)—CONTRACT OF ASSIGNMENT—CONSTRUCTION.

A provision in a contract by which complainant agreed to assign certain patents relating to elevators to defendant that defendant should test the patented apparatus with reasonable diligence, "and, if such test results satisfactorily, within such further reasonable time as is convenient to put such apparatus into practical use," bound the defendant absolutely, having accepted the test as satisfactory, to put the apparatus into some practical use within a reasonable time thereafter, and impliedly to put in all the patented elevators it reasonably could with due regard to its business interests.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 202.*]

3. PATENTS (§ 203*)—CONTRACT OF ASSIGNMENT—RESCISSION.

Under such contract, which provided for the payment of royalties to the assignor a breach of the absolute undertaking to put the apparatus to some practical use, which would have been satisfied by any use, however small, is not ground for rescission of the contract, since such requirement does not go to the whole consideration, but, to entitle the assignor to a rescission in equity, he must show that the implied and substantial part of the stipulation has been violated, and that the assignee has failed to exert itself in good faith to install the patented apparatus whenever in reason it was feasible in view of its business and opportunities.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 203.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Equity. Suit by Michael C. Neenan against the Otis Elevator Company. Decision for the defendant, but decree held in abeyance.

This is a bill in equity to compel the defendant to reassign to the complainant certain patents conveyed by him to it on the 24th day of May, 1904. The case turns almost wholly upon the construction of the contract, which provided, in substance, as follows: First, second, third, and fourth, that the complainant for $500 should assign to the defendant two existing patents and one patent then applied for, and granted on February 9, 1909; fifth, that on the 1st day of July, 1904, the defendant should pay a further sum of $500, and upon the issue of the entire patent $1,000; sixth, that the defendant should likewise pay a specified royalty upon every elevator embodying any of the patents referred to with certain specifications as to the amount of royalties; seventh, that the defendant should further, "if it elects to continue to manufacture the elevators," pay to the complainant $8,000 within three years from the date of the agreement; eighth, that defendant might at any time cancel the agreement by returning the patents; ninth, that beginning with January 1, 1907, the defendant "shall guarantee that the royalty upon elevators erected and constructed by it * * * shall amount to not less than three thousand dollars;" tenth, that the defendant would test the apparatus with reasonable diligence, "and, if such test results satisfactorily, within such further reasonable time as is convenient to put such apparatus into practical use."

The complainant has assigned all his patents to the defendant, and the defendant has paid the complainant $500 on the completion of the contract, $500 on July 1, 1904, $1,000 subsequently, which was the sum due him upon the issuance of the patent, $8,000 on April 11, 1907, $3,000 on January 1, 1907, and the same amount on January 1, 1908. It likewise tendered the sum of $3,000 on January 1, 1909, but that the complainant refused. The defendant in February or March, 1906, tested the patented apparatus in a testing tower which is a part of its factory at Yonkers, N. Y., and found it to be satisfactory. Subsequently it paid to the complainant, as above stated, the $8,000 provided in the contract; but it has not put any elevator manufactured under the apparatus into practical use since the contract was made.

The complainant specifies four instances in which the defendant could have put the apparatus into practical use, and which he says it refused to accept. These four are as follows: The Beaver Building, the Metropolitan Tower, the Ritz-Carleton Hotel, and the Park Row Building. In each of these cases the complainant urged the defendant to put in the elevator, but the defendant declined to do so. The first building was the Beaver Building, in April, 1906, at which time the complainant had an interview with Mr. John, one of defendant's engineers, and they went over the Beaver Building together. Both agreed that the change could be made, but the complainant says they agreed it could be readily made, and John says that the work would have had to be rebuilt and would have entailed considerable expense for rebuilding, including the overhead work, the ropes, and the system of counterbalances. There had been a defect in the elevator in the Beaver Building which was improved at less expense without the installation of a new elevator. The next building was the tower of the Metropolitan Life Insurance Company in 1907. The complainant procured of the architect a request for specifications for the use of the elevator for that tower, and on February 1, 1907, one Brown, consulting engineer of the defendant, wrote an unfavorable opinion of the complainant's patent for use in the building in question, referring to it as "an untried and experimental device," and as a "theoretical and erroneous, untried safety device." He was asked for his opinion in this matter not as defendant's engineer, but as an expert. Upon this opinion apparently the architects in charge of the tower declined to install the elevators. The next building was the Ritz-Carleton Hotel. The defendant refuses to submit a proposal or consider putting in the complainant's elevator, giving as a reason that it was unwilling to install a new type of elevator in so important a building, containing as it did 18 or 20 elevators. This matter of the Ritz-Carleton Hotel came up in October, 1908. Toward the end of that year the defendant offered to install at a value below cost the elevator in the Park Row Building. Only one elevator was to be installed in that place and nego-

tiations were pending, but while they remained undecided the complainant returned the guaranty check and demanded back the patents assigned, after which the negotiations were dropped by the defendant. On January 12, 1909, the complainant sent the letter returning the check of $3,000 and redemanding his patents assigned under the contract.

Harry E. Knight and Martin A. Ryan, for complainant.
Ewing & Ewing, for defendant.

HAND, District Judge (after stating the facts as above). The complainant's contention that the defendant has canceled the agreement under the right reserved in the eighth paragraph is certainly unfounded, and may be dismissed without serious consideration. This leaves as unperformed by the defendant the provision of the ninth and tenth paragraphs, and to determine whether it is in default on those paragraphs their meaning first must be determined. The ninth paragraph does not mean, as the complainant insists, that the defendant shall construct elevators each year whose royalty shall amount to $3,000. The guaranty is no more than a promise that in any case the complainant shall receive $3,000. I do not, of course, mean that the complainant has no independent interest in the erection of elevators, or that the defendant could monopolize his patent, and refuse to exploit it mala fide. That situation is covered by the tenth paragraph; but under the ninth the defendant only agrees that, in case its bona fide efforts to exploit the invention shall not result in royalties equal to $3,000, it will nevertheless pay that amount, and so insure the complainant of a certain minimum of royalties regardless of the success of his invention. This meaning is the usual one attached to the word "guarantee," a word commonly used to cover the default of another, upon his own obligation. It should not usually be interpreted as an undertaking by the guarantor to perform the obligation itself. While in this contract the performance guaranteed consisted of certain acts of the guarantor itself, still, if the obligation extended to the performance of those acts, it should have been so written. To omit a direct obligation and to substitute an agreement of guaranty indicated an intention, not to promise to perform the acts guaranteed, but to make a payment in case they were not performed.

There remains, therefore, the question of the tenth paragraph. I agree with the complainant's construction that, if the test was made and proved satisfactory, the defendant by this stipulation agreed actually to put the apparatus into practical use, and that it would be none the less in default on its part if it failed to do so, even though it had done its best to install the invention. The condition of the test could only have been to ascertain in advance whether the apparatus could be used practically, and, as it proved satisfactory and the defendant had signified its election "to continue to manufacture the elevators" by the payment of $8,000 as was provided in the seventh paragraph, it was certainly too late thereafter to say that it could not find a place for the apparatus. This stipulation in the tenth paragraph is, however, limited by very vague terms as to the time within which performance must be made; and, besides, the degree of performance is also left undetermined. The words are "within such further reasonable time as is

convenient to put said apparatus into practical use." The phrase "within such further reasonable time as is convenient" does not, of course, extend the time during the whole length of the patent. To adopt such a construction would be to deprive the covenant of any meaning. I think there would be no question of this if the words "as is convenient" were omitted; and I do not regard them as contributing any definite extension of the time. Indeed, I can see very little that they add to the words "within such reasonable time." They can hardly be held to signify more than that defendant should not disarrange its ordinary business for the purpose of putting in the complainant's elevators.

Therefore, the tenth paragraph appears to me to bind the defendant to find a place within which it can put the apparatus into practical use within a reasonable time, and the four years which have elapsed since the test proved the apparatus satisfactory is a reasonable time. I must conclude, therefore, that the defendant is in default upon the contract. Before accepting the apparatus, it should have ascertained whether its business opportunities justified it in assuming that it could find a place to install the apparatus, for, although it may honestly and bona fide at the present time find that it was mistaken in its judgment or in the value of the apparatus, that is a mistake the responsibility of which it must bear. In short, I cannot interpret the stipulation as no more than a promise to use the apparatus, if in any case it might from time to time find it useful. But, although this construction puts the defendant in default, it by no means justifies the relief in equity which the complainant demands. As I have already said, the stipulation in no way indicates the number of elevators which the defendant should install, and that omission, indeed, was probably necessary from the nature of the business. Therefore the default in question would have been answered by the installation of a few elevators, because although the defendant promised absolutely to put in some elevators, and impliedly promised to put in all that it reasonably could with due regard to its business interests, still, if it had put in two or three, it would not have been in default upon the absolute part of its covenant, and to show a default upon the implied part the complainant must show that it has unreasonably or in bad faith refused to put in others. In other words, although its obligation was absolute to put the apparatus into some practical use within a reasonable time, the degree of such use necessarily depended upon the opportunities of the defendant's business. Now, in so far as concerns the breach of what I have called the absolute part of the defendant's obligation—that is, the requirement to put the apparatus to some practical use—it is not enough to base a rescission upon. That part of the covenant certainly does not go to the whole consideration as it must if rescission is to be granted. Kauffman v. Raeder, 108 Fed. 171, 52 C. C. A. 126; Howe v. Howe & Owen Ball Bearing Co., 154 Fed. 820, 83 C. C. A. 536. It is no doubt true that it is impossible to assess the damages upon that breach, but if I am right in construing the absolute undertaking to be wholly indefinite in degree, and if it would be satisfied by any small performance, obviously it was very far from going to the whole consideration, and the impossibility of assessing damages will not be enough.

To succeed, therefore, the complainant must show that the implied and substantial part of the stipulation has been violated, and that the defendant has failed to exert itself in good faith to install his apparatus wherever in reason it was feasible. That covenant was the real inducement for the assignment of his patents, and it was from the royalties so arising that he was to be paid. In proof of such a default he instances the four buildings which have been mentioned in the statement of facts. There seem to have been good reasons in each case why the defendant should not have put in the complainant's elevators. In the case of the Ritz-Carleton Hotel, I do not think the defendant need have put in 18 or 20 elevators of a type which it had only tested in its factory. As I have said, that test in my judgment bound it to try the elevators practically, but it is one thing to make practical use and another to put in upon one contract a great bank of so many. In the case of the Metropolitan Tower, it cannot be said that Brown's letter which controlled the architect was the act of the defendant at all, and, even if it were, there were obviously good reasons which justified the defendant declining on such an extraordinary building to put in a device necessarily as yet somewhat experimental. In the case of the Beaver Building the needs of the customer were supplied at less expense, and certainly the defendant was required to do the work as economically as it reasonably could. There remains, therefore, the Park Row Building, and the complainant does not contradict the fact that the negotiations were still pending when he attempted to rescind the contract. This absolves the defendant.

Upon the proofs, therefore, I do not think that the complainant has yet shown any such default as would justify his rescission. In saying this I am aware of the difficulties under which the complainant labors, which may be such as prevent him from obtaining justice even when the defendant is in fact doing him injustice. Those difficulties are, however, inherent in the position in which he has placed himself in giving over his patents to the defendant upon an undertaking which did not define the amount of "practical use," to which they must be put. In so doing he necessarily put himself in their control, and he cannot retreat from the position without some affirmative proof that they have abused that control. The degree to which they could in fact exploit his invention depends upon their business opportunities for its use, and, until he can show that they have failed substantially to avail themselves of some such opportunities, his difficulties necessarily arise from the fact that he has chosen unwisely. Therefore I shall be obliged to dismiss this bill.

However, in view of the fact that in my judgment the defendant is in actual, although not serious default, and in view of the fact that a decree speaks from the time when it is filed, if the complainant so wishes, I will enter no decree but hold the suit open, and he may, if so advised, present further proofs at any time upon application to the court, which will show that the defendant's default is such as goes to the substance of the contract. Moreover, if the complainant sees fit to accept a dismissal, I will impose costs on the defendant.